# Exhibit A

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of Arbitration ) | |
| ) | |
| Between ) | |
| ) | **OPINION and AWARD** |
| **CWA DISTRICT 6, LOCAL 6322** ) | |
| ) | Case No. 01-19-0004-5336 |
| and ) | |
| ) | |
| **THRYV, INC., f/k/a DEX YP** ) | |
| _____ ) | |

The undersigned was appointed by the American Arbitration Association as Arbitrator of the dispute described herein.

The parties agreed that the Arbitrator would hear the procedural issue through briefs and reply briefs before determining if the issue should proceed on the merits. The briefs and reply briefs were received from the parties as agreed.[1]

**BEFORE**: Mattye M. Gandel, Arbitrator


**APPEARING FOR THE UNION**:

    Matt Holder, Esq.
    David Van Os & Associates, P.C.


**APPEARING FOR THE EMPLOYER**:

    Arthur G. Telegen, Esq.
    Seyfarth Shaw, LLP


**ISSUE**:

    Is the matter arbitrable? If so, did the Employer have just cause to terminate the Grievant, George Animadu? If not, what shall be the remedy?

---

[1] As there was no testimony in this matter, the Arbitrator relied upon the documentation submitted by the parties in their briefs.

BACKGROUND:

**Thryv, Inc., f/k/a DEX YP** (Company/Employer) and **CWA, District 6** (Union) are parties to a Collective Bargaining Agreement (Agreement) entered into the record of the hearing as Union Ex-2, submitted with the Union's brief. The matter herein arose as a result of the termination of the Grievant. The parties were unable to settle the dispute through their grievance procedure. Hence, the Union has submitted same to this Arbitrator for a final and binding decision.

POSITIONS OF THE PARTIES:

**The Employer's position** is that two elements are usually necessary to dismiss a grievance based on laches: unreasonable delay and prejudice; that the Union's grievance is 6-years old and that there is prejudice in abundance. As for prejudice, the Company has no witnesses and few records and the only documents in this matter are those that the Union preserved and presented to the Company only very recently. Further, the Company has no means to respond to whatever testimony the Grievant will present.

The Union claims that the passage of time was the Company's fault as it was waiting for a Step 2 meeting, a prerequisite for arbitration, and that it had to go to the National Labor Relations Board (NLRB) to force the Company to agree to sit the grievances in 2018. However, it is the Company's position that in the absence of any documentation to contradict the Union's position, the Company entered into an

agreement to sit grievances but it admitted no wrongdoing. Additionally, despite the fact that the Company informed the Union at the Step 1 grievance meeting in 2014 that it denied the grievance, the Union waited nearly a year before appealing the grievance to Step 2 and then used an outstanding information request as a basis for further delay. It is the Company's position that the Union appealed the denial of the Step 2 over a year and a half after the termination and several months after the Company told the Union at the first step hearing why it was denying the grievance and that it did not comply with the Agreement's requirement for a demand within two weeks of a Step 1 answer. However, the Union did nothing to seek a Step 2 meeting.

The Company asserts that regarding the timing requirements of Article XIX, Section 7, the Union sat idle for a year after the Company denied its grievance at Step 1 in 2014 before appealing the Company's decision and then waited another year before submitting its information request in September 2016. Further, once the Company supplied responses in mid-2017, the Union never again attempted to schedule a Step 2 meeting until October 2018 but rather slept on its rights for years and chose not to pursue the grievance. Nothing in the Agreement suggests that the grievance procedure allows the Union to sit silently for years and then blame the Company for the delay and that nothing prevented the Union from exercising its right to move this case to arbitration at any time starting in the summer of 2014.

Finally, it is the Company's position that this case warrants dismissal on laches grounds as six years have passed, there is a new company, there is nobody with

knowledge of the facts around, the Company has no witnesses who could address the Grievant's attempts to transfer blame for his failed performance.

**The Union's position** is that the laches argument does not concern a violation of the agreement such as a missed deadline; that it is an amorphous argument that the Union lost its right to arbitrate because it did not move quickly enough to arbitration; that the Company's position ignores its role in the delay and the scale of the problem the Union faced in 2017 with so many cases.

It is the Union's position that it is not challenging a practice that has been ongoing for years but is a case involving a discrete incident of discipline; that the adverse action taken against the Grievant was timely grieved and that the Company does not claim that the Union missed a procedural deadline specified in the Agreement but rather faults the Union for not brining the case to arbitration sooner.

The Union asserts that the Company has unclean hands as it declined to meet to discuss this case in 2017 when the Union sought to arrange meetings; that it is responsible for why this case was not heard earlier and that had the Company heard the grievance in 2017 at the second step, the Union would not have had to sought relief from the NLRB and this procedural dispute would have been avoided.

Moreover, it is the Union's position that it has a discretionary right under the terms of the Agreement to self-help and defaulting the grievance through the steps of the Agreement; that this discretionary right is not mandatory as the appeal to the second step says, "may" and not "shall" and does not require such escalation and; that,

4

in the instant matter, because the Union had so many cases with a financial cost, it instead reached out to the NLRB to get all the pending grievances addressed without the cost of arbitration and consistent with the parties' obligations under the Agreement to meet on grievances at the second step.

Furthermore, the Union asserts that the only deadlines in the Agreement related to grievance or arbitration are those requiring a case to be appealed to the next step once a decision is issued and that the Union missed no such deadlines, which the Company does not argue. However, the Union contends that the Company, which is also responsible for the grievance process, could have moved the case along by hearing the grievance in 2017 instead of waiting almost year from the first step grievance meeting in 2014 to issue a denial in 2015.

It is the Union's position that the two-week period referenced in the Agreement's default provision does not require a meeting to be held within two weeks but, rather, allows the Union after two weeks to exercise its discretionary right to take the grievance to the next step; that the parties are free to include language that could have required cases to be heard in a specified amount of time but declined to do so; that the limits cannot be added to the Agreement under the guise of laches; that application of laches would impose a deadline for processing cases, which is absent from the Agreement and outside the scope of the Arbitrator's authority and that this grievance is not facially repugnant to the Agreement.

The Union's position is that it is not responsible for the Company's failure to preserve its defenses but the Union's preservation of the documents largely moots the Company's contention that passage of time has prejudiced it; that the Company has made no offering of efforts made to preserve records or track potential witnesses; that the Company was fully aware that this case was outstanding and that it was incumbent upon it to preserve its defenses, which it did not do.

The Union asserts that it never waived or abandoned this grievance. In fact, it submitted information requests and sought to schedule the case prior to 2017 and protect its rights but that when the matter was not resolved, it went to the NLRB to have this and other grievances heard. It is inequitable to penalize the Union for this delay when it trusted the process and waited for mutually agreeable hearing dates and, then, when none was forthcoming, filed an unfair labor practice charge with the NLRB that resulted in this grievance being heard.

Finally, the Union argues that should the Arbitrator find that laches is applicable to this matter, the doctrine should not be applied to bar the case in its entirety and that the equitable interests that laches protects can be addressed by adjusting the remedy.

Therefore, this case should proceed to a hearing on the merits because doubts concerning arbitrability should be resolved in favor of arbitration and asks this Arbitrator to permit a full hearing on this issue and to deny the Company's motion to dismiss the grievance.

**OPINION**:

This Arbitrator has always supported the need to proceed to the merits of a particular grievance whenever possible. Not only do court decisions favor this approach, but also arbitrators agree that it is best for the parties to receive a resolution of a dispute so that it will not fester, which could negatively affect workplace productivity and labor peace.

In contract interpretation matters, it is important to read the language as a whole. One part of a contract or an article cannot be read in a vacuum. Parties have negotiated specific language and often a party has given up other benefits to obtain language favorable to its position.

In the instant matter, several sections of Article XIX/Article XX, Grievances,[2] are important to a decision in this matter.

> Section 1.
>
> The Union shall be the exclusive representative of all the employees in the bargaining unit for the purposes of presenting to and discussing with the Company grievances of any and all such employees arising from such employment;
> . . .
>
> Section 2.

---

[2] In the Company's brief, it referred to the Grievance article as Article XIX. However, the Union attached a copy of the 2013 Collective Bargaining Agreement, which cited the Grievance article as Article XX. Of significance is that the wording of both articles of Section 7 are exactly the same. Therefore, if the proper article number is XIX or XX, the language is the same. For the purposes of this Award, this Arbitrator will use the designation of this article as Article XX.

7

>a. Any employee complaint . . . which is reduced to writing and delivered by a Union representative in accordance with Section 2.b. following, within forth-five (45) days of the action complained of shall be considered and handled as a formal grievance.
>b. the grievance procedure shall normally consist of two (2) successive steps . . .
>. . .
>
>Section 3.
>
>a. The decision made at the first level of the grievance procedure may be appealed to the second level of the grievance procedure provided such appeal is submitted within two (2) weeks of the date the decision is communicated to the Union.
>b. A decision at the second level of the grievance procedure <u>or default on the Company's part to meet with the Union,</u> as explained in Section 7., at the second level shall be construed as full completion of the "Formal Grievance" procedure. (emphasis added)
>c. the decision of the Company as to grievances submitted shall be confirmed in writing to the Union.
>. . .
>
>Section 7.
>
>Meetings at each level of the grievance procedure shall be arranged promptly.
>   If, due to the Company's actions, a mutually agreeable meeting date is not arranged within two (2) weeks of either the Company's receipt of the initial notification or the appeal of the grievance, the Union may present its original grievance to the next highest level of the formal grievance procedure.
>. . .

When the language of Article XX is reviewed, several conclusions can be drawn. It was very clear to this Arbitrator, that these parties carefully crafted a grievance procedure with filing requirements at several levels. Parties include language in their Agreement and have a right to expect that the language will be applied.

8

First of all, as indicated in Section 1, the Union is responsible for representing its members in the presentation and discussion of the grievances with the Company. In the opinion of this Arbitrator, the processing of a grievance is the responsibility of the Union. It is its grievance. This Arbitrator cannot agree that it is the Company's responsibility to inquire about the status of a Union grievance especially when the language of Section 1 clearly supports that conclusion. The Union represents the employees, amongst other duties, for the purposes of presenting and discussing with the Company grievances. It does not say that it is the Company's responsibility.

The Union cited *Gaylord Container Corp.,* 93BNA LA 465,468 (Abrams 1969), in support of its position that the Company should have reached out to the Union regarding the status of this matter. Arbitrator Abrams stated that

> The Company need not wait around for years for the Union to decide whether it will bring a matter to arbitration. All it needs to do is after a reasonable period of time – one would think a period of months would be more than enough time - to formally ask the Union whether it intends to process a matter to arbitration. <u>Alternatively, it can seek new contract language specifying a time limit.</u>
> (emphasis added)

While the Employer might have reached out to the Union to inquire about the status of the grievance or to agree to meet at the second step, there is no language in this Agreement requiring this Company to do so. For this Arbitrator to require the Company to meet with the Union would inappropriately add language to the Agreement, which this Arbitrator is not empowered to do. Additionally, *Gaylord* can be differentiated from this matter in that Arbitrator Abrams suggested that the parties could negotiate new

9

contract language. However, the parties in this matter did not have to "seek new contract language specifying a time limit." They already had very specific and clear time limits at each step and clear language as to what happens if the Company defaults to meet with the Union.

Further, Section 2.a. is similarly very clear. The record established that the Grievant was terminated on January 13, 2014 and that the Union timely filed a grievance on February 20, 2014, Union Ex-3. Therefore, it was undisputed that the Union, when, in conformance with the terms of the Agreement, reduced the Grievant's complaint to writing and delivered it "within forth-five (45) days of the action complained of," the grievance was considered a "formal grievance" as envisioned by the parties.

Two other sections of this article (Sections 3 and 7) must be considered together to fully interpret the language of this article. Regarding Section 3.a., it was undisputed that the Company and the Union met at the first level of the grievance procedure on October 14, 2014 and that the Company denied the grievance on August 7, 2015, Union Ex-4 and Company Ex B.[3] According to documents submitted with the Union's brief, it appealed the denial to the second level on August 17, 2015, Union E-5, which was within two weeks of the denial and in compliance with the Agreement.[4]

---

[3] While this Arbitrator noted that there is a considerable amount of time between the first step meeting on October 14, 2014 and the Company's denial on August 7, 2015, there is no language in the Agreement specifying the amount of time the Company has to respond.

[4] The Company argued that the Union "Took no steps to seek a Step 2 meeting." However, this Arbitrator cannot agree. In the August 17, 2015 letter to the Company, Union Ex U-5, appealing the termination to the second level, the Union "request[ed] a meeting at your earliest convenience." However, even if the Union requested a meeting, Article XX, Section 7 indicated that if a "mutually

However, Article XX, Section 3.b. must also be considered. This language states that a decision at the second level "or default on the Company's part to meet with the Union . . . at the second level" shall be construed as full completion of the "Formal Grievance" procedure. The record established that during this time period, the parties never met to discuss the grievance at the second level. Therefore, it must be concluded that because the Company defaulted on its part to meet with the Union at the second level, as was its right, the "Formal Grievance" procedure "shall be construed as full completion" of the procedure.

Additionally, Section 7, which was referred to in Section 3.b, states that if, due to the Company's default at the second level, a meeting date is not arranged within two weeks, the "Union may present its original grievance to the next higher level of the formal grievance procedure." It was clear from the Union's brief and documentation that a meeting was not arranged within two weeks of August 17, 2015, the date the Union appealed the termination to the second step. Therefore, since there are only two steps in this grievance procedure, the Union had the right in August 2015 to proceed to the next higher level of the formal grievance procedure, which was arbitration.

The Union asserted that the word "may" appeal to the next level gave it the option to appeal the decision or to default. While this Arbitrator agrees that the Union has the right to appeal or not appeal the Company's decision to the next level, there is

---

agreeable meeting date is not arrange within two (2) weeks of . . . the appeal of the grievance, the Union may present its original grievance to the next higher level of the formal grievance procedure." The Union failed to do so.

11

nothing in the Agreement allowing the Union to decide not to appeal the decision within two weeks and then reassert its right at some time in the future.

The Union cited the fact that the language did not say "shall" and that, therefore, it had the right to defer its appeal. In the opinion of this Arbitrator, the "may" referred to the fact that the Union could make the decision to appeal to the next level within two weeks, if it so chose. If the language had said "shall," the Union would necessarily have to appeal every Company denial to the next level. However, there are grievances which a Union might not want to move to the next level and the use of the word "shall" would not have given the Union that discretion. However, this Arbitrator cannot agree that because the language says "may," it allows the Union to not appeal until whatever date in the future it decides to appeal. Grievance procedures are agreed upon so that parties can resolve disputes in an efficient and quick manner. The Union's actions in this matter did not fulfill that guiding principle of the grievance procedure.

Referring again to Section 3.b., the language states that "a default on the Company's part to meet with the Union . . . at the second level shall be construed as full completion of the "Formal Grievance" procedure." The parties did not mutually agree to meet within two weeks of the Company's inaction and, therefore, the Union had the option to move the grievance to the next higher level and to proceed to arbitration at that time. However, the record established that the Union did not appeal the denial of the termination to arbitration until December 2019.

In support of its position, the Union cited a *Labor Decision* 4649480-AAA, 2018 BNA LLA Supp.464980, p.1-2 (Ross). Two differences were noted between the *Labor Decision* and this matter. First of all, whereas that arbitrator pointed out that the "Public School should have held a Step 3 hearing and issued a Step 3 decision on the grievance," there was no requirement for this Company to issue a decision at the second level; it could simply default. Secondly, in that case, the teachers' union contract provided "no deadline for arbitration where the Public Schools fails to hold an initial hearing or issue a Step 3 decision." In contrast, in this matter, either party had the right, within sixty (60) days after the completion of the Formal Grievance procedure, to submit the grievance to arbitration.

The Union asserted that during the years between August 2015 and December 2019, it was waiting for a response to its information request; that when none was forthcoming, it resorted to filing an unfair labor practice charge with the NLRB and that after the NLRB charges were settled, the Company and the Union met on outstanding grievances.

However, in the opinion of this Arbitrator, because the Union did not hear from the Company to set up a meeting after it appealed the termination to the second level, Section 7 clearly gave the Union the right to appeal the termination to the next higher level two weeks from the time the Company did not meet with the Union, which was August 17, 2015.

It was undisputed that the Company did not respond to the Union's second level grievance. However, having not heard from the Company to set up a meeting, the Union had the right to file for arbitration. Instead, on September 28, 2016, over a year later, the Union requested information regarding the grounds for the termination. Not only was that request long overdue, but also the Union did not have to wait for receipt of information to file for arbitration. All the Union had to do was file for arbitration in August/September 2015 and then request information needed while the matter proceeded to arbitration on the merits in a timely manner. Instead, the Union waited several years until 2019 to file for arbitration claiming that "may" gave it the right to defer its original grievance to the next higher level until it so chose.

However, the basic premise of the grievance/arbitration mechanism is to afford the parties a quick resolution of disputes and, in fact, the parties agreed in Section 7 of Article XX that "[M]eetings at each level of the grievance procedure shall be arranged promptly." The Union faulted the Company for waiting so long to invoke laches and thereby impeding the expeditious processing of arbitrations. However, the Union's action of waiting several years to file for arbitration did not fulfill its commitment of resolving issues quickly. After all, it was the Union who chose not to file for arbitration in 2015.

The Union claimed that by October 2017 there were multiple grievances pending at the second step of the grievance procedure and acknowledged in its brief that "[A]t that point (October 2017) the Company had not met with the Union on any of those

cases, including those of the Grievant." However, back in August 2015, when the Company had not met to discuss this grievance, the Union had the opportunity and the right to proceed to arbitration. In fact, Article V, Arbitration, Section 1 states that

> If, during the term of this Agreement, . . . a difference shall occur, between the Union and the Company, and continue <u>after all steps of the "Formal Grievance" procedure</u> . . . shall have been undertaken and <u>completed</u>, regarding (emphasis added)
> . . .
> c. the dismissal for just cause . . . of any commission employee, . . . with more than two (2) completed years' net credited service, or . . .
> d. . . . then in any such event, either the Union or the Management may submit the issue of any such matter to arbitration for final decision . . .

Therefore, it must be concluded that the Union had the opportunity, once the "Formal Grievance" procedure was completed as of August 2015 to submit the issue of the Grievant's termination to arbitration for a final decision. It chose not to.

Further, Section 2 of Article V states that

> In the event that either party hereto, within sixty (60) days after completion of the Formal Grievance procedure aforesaid, elects to submit a matter . . . to arbitration the parties agree that the matter shall be so submitted, and agree that such submission shall be to one arbitrator . . .

Given that the Union had the right under the terms of the Agreement to file for arbitration in 2015, but did not, but rather chose to rely on a claim that it had the right to default until it chose to proceed, the Company is well within its right to claim laches at this time.

Finally, after all these years, despite the fact that the Union retained certain documents, it was undisputed that no witnesses were available to prove the Company's

15

burden of just cause. Further, in a decision by Arbitrator Goldberg, in *Lewis Bakeries, Inc.,* 138 BNA LA 118-119 (Goldberg 2017) the equitable doctrine of Laches was cited as the unreasonable delay of a claimant asserting a claim. In the instant matter, this Arbitrator must conclude that not only did the Union not follow the timelines set forth explicitly in the Agreement, but also by not following the timelines, it unreasonably delayed its claim. The Union had the opportunity at the conclusion of the "Formal Grievance" procedure to proceed to the next step but it did not follow the clear language of the Agreement and unreasonably delayed the process supporting the Company's claim that the matter should not proceed to its merits.

In conclusion, this Arbitrator has reviewed and carefully weighed all the evidence and arguments presented by both parties through briefs even though many facets were not referred to in the Opinion. Considering all the facts, this Arbitrator must decide that the matter is not arbitrable.

In consonance with the proof and upon the foregoing, the undersigned Arbitrator hereby finds, decides, determines and renders the following:

### A W A R D

1. The matter is not arbitrable.
2. The Grievance is denied.

_____
Mattye M. Gandel

16

Dated: August 3, 2020
       South Orange, NJ 07079


AFFIRMATION

I, Mattye M. Gandel, hereby affirm that I am the Arbitrator in the above matter and that this document, which I have executed this day is my Opinion and Award, issued in accordance with my oath as Arbitrator in resolution of the foregoing matter and in compliance with all relevant and applicable laws.

_____

hereby finds, decides, determines and renders the following:

## AWARD

1. The matter is not arbitrable.

2. The Grievance is denied.

*Mattye M. Gandel*
Mattye M. Gandel

Dated: August 3, 2020
    South Orange, NJ 07079

## AFFIRMATION

I, Mattye M. Gandel, hereby affirm that I am the Arbitrator in the above matter and that this document, which I have executed this day is my Opinion and Award, issued in accordance with my oath as Arbitrator in resolution of the foregoing matter and in compliance with all relevant and applicable laws.

*Mattye M. Gandel*

16